**TRI–STATE INSURANCE COMPANY OF MINNESOTA, Plaintiff,**

v.

**H.D.W. ENTERPRISES, INC., Amy Lynn Criqui, Individually and as Mother and Next Friend of Corvin Lee Criqui, a minor child, and Berkley Danielle Criqui, a minor child, and Timothy M. Acton, Defendants.**

No. 00–4020–SAC.

United States District Court,
D. Kansas.

Dec. 5, 2001.

---

1204

Mark A. Buck, Nathan Burghart, Topeka, KS, for plaintiff.

Kent M. Bevan, John F. Wilcox, Jr., Dysart, Taylor, Lay, Cotter & McMonigle, P.C., Ronald L. Holt, Watkins, Boulware, Lucas, Miner, Murphy & Taylor, LLP, Kansas City, MO, for HDW Enterprises Inc.

David R. Morris, Kansas City, MO, for Amy Lynn Criqui.

Jennifer L. Groover, Shook, Hardy & Bacon L.L.P., Dana M. Harris, Harris, McCausland & Schmitt, P.C., Kansas City, MO, for Timothy M. Acton.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This declaratory judgment case based upon diversity jurisdiction comes before the court on Tri–State Insurance Company of Minnesota's (hereinafter "Tri–State") motion for summary judgment. The fundamental issue posed by the parties is whether any material issue of fact precludes a determination of insurance coverage for a certain bus which was involved in a fatality accident in Kansas on September 27, 1999. Defendant Timothy Acton was driving the bus at the time of the accident in which defendant Amy Criqui's husband, the father of Corvin and Berkley Criqui, was killed. Defendant H.D.W. Enterprises, Inc., (hereinafter "HDW"), a Missouri corporation, allegedly owned the bus at the time, and had a written policy of automo-

bile insurance from Tri–State, a Minnesota corporation.

## SUMMARY JUDGMENT STANDARD

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The non-movant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

The parties have provided the court with an abundance of evidence and memoranda which the court has carefully reviewed. After so doing, the court is convinced that summary judgment in defendants' favor is appropriate and Tri–State's motion for summary judgment is denied.

## FACTS

The facts set forth in this section are intended to be a summary of the events which transpired. Other facts crucial to

resolution of the issues are set forth in the analysis which follows.

HDW is in the business of sanitation and refuse hauling. On September 28, 1996, Harvey Williams, the principal shareholder of HDW, purchased a school bus at an auction, on behalf of HDW. Williams did not intend to use the bus in the business of HDW. The seller soon thereafter sent Williams the certificate of title for the bus, the back of which was signed by seller. The certificate did not indicate who the purchaser of the bus was, and neither Williams nor anyone else completed the assignment section of the certificate of title until after the bus accident. It was not until November 30, 1999, that the certificate of title for this bus was completed, and not until December of that year that legal title for this bus was issued to HDW.

In December of 1997, Williams' daughter, Kimberlie Allen, and her husband Terry, took over the management of HDW. In October of 1998, HDW applied for insurance through Doyle Buetzer, who had solicited their business. Buetzer's agency, Green Hills, had entered into an agency agreement with Tri–State in July of 1998. Buetzer acted as an agent for various other insurance companies, as well.

HDW received a commercial package policy, which included automobile coverage for certain vehicles listed in the schedule of the policy. The bus involved in the accident is not listed as a covered vehicle in the policy. It is disputed as to whether HDW revealed, at the time of its initial application for insurance with Tri–State, its ownership of vehicles that were not listed in the schedule of the policy, including the bus. Williams did not want to pay insurance premiums for vehicles not used in his business.

In late August 1999, Williams told Buetzer he needed to get insurance on the bus, and told Allen to get the proper insurance and license for the trip. Allen then spoke with Buetzer on one or more occasions to get insurance for the bus. Buetzer's note dated September 7, 1999, reflects that Kim Allen called Buetzer regarding insurance on the bus, and Buetzer noted the need to get the VIN number for the bus. On or about September 9, 1999, when Allen requested insurance for the bus, Buetzer replied "OK."

The record contains an endorsement memorandum from Buetzer to Tri–State requesting coverage for this bus, dated September 15, 1999. The parties dispute whether this memorandum was actually created on that date, however, because the person who signed it did not work on the 15th, and it contains a VIN number which Buetzer did not receive until after the accident, and which Buetzer erroneously recorded in the memo dated September 15th and on the insurance card he sent to HDW after the accident.

On September 27, 1999, the bus was involved in a fatality accident in Kansas while Tim Acton, an acquaintance of Williams', was driving. The following day, Buetzer notified Tri–State of the accident. On October 7, 1999, Buetzer met with Allen in her office and got the VIN number for the bus, but recorded one of its digits erroneously.

On October 19, 1999, Tri–State received the endorsement memorandum dated September 15, 1999, from Buetzer regarding bus coverage. Tri–State soon thereafter attempted to call Buetzer to decline coverage, but could not reach him, so notified him by memo dated October 21, 1999, that it preferred not to write insurance on this type of vehicle. This lawsuit regarding coverage of the bus followed.

## ANALYSIS

### I. Written Insurance Policy

In moving for summary judgment, plaintiffs first attempt to show that no

written policy of insurance was established for the bus. It is undisputed that in November of 1998, Tri–State issued to H.D.W. a Commercial Package Policy, No. CPP 6948290–10, which included Commercial Auto coverage. (Dk. 136, Exh. 19). That policy does not purport to cover all vehicles then owned or after-acquired by H.D.W. Instead, the policy unambiguously restricts its coverage to certain vehicles listed by description and serial number in the policy declarations.

The policy shows a "symbol 7" to describe the coverage for the vehicles listed in the policy. (*Id.*, Commercial Auto Policy, p. 1). The policy describes "Symbol 7" coverage as: "SPECIFICALLY DESCRIBED 'AUTOS.' Only those 'autos' described in ITEM THREE of the Declarations for which a premium charge is shown ..." (*Id.*, Business Auto Coverage Form, p. 1 of 11). Item Three of the Declarations of the Business Auto Coverage Form lists 19 specific vehicles as covered under the policy. (*Id.*, Business Auto Coverage Form Declarations, Schedule of Covered Autos, Item Three, p. 1–3). The parties agree that H.D.W.'s written policy of automobile insurance from Tri–State did not expressly cover the bus involved in the accident on September 27, 1999, as the bus is not included in those autos scheduled or listed as covered under the policy. (*Id.*) No other written policy of insurance is alleged to cover the bus at the time of the accident.

The policy contains a specific provision regarding coverage of after-acquired autos. Section B, captioned "OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS," states, "if symbol 7 is entered next to a coverage in ITEM TWO of the Declarations, an 'auto' you acquire will be a covered 'auto'" for that coverage only if:

a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

(*Id.*, Business Auto Coverage Form, p. 1–2 of 11). Appropriately, the parties do not rely upon this provision. H.D.W. did not acquire the bus after the policy began. Instead, it is uncontradicted that H.D.W. purchased the bus from a school district at an auction on September 28, 1996, more than two years before it purchased the policy of insurance.

Further, it is undisputed that HDW has not met the conditions set forth in subsections "a" and "b" above for coverage of after-acquired autos. It is uncontested that HDW's policy was not for all "autos" that it owned. Further, HDW does not allege that the bus replaced an auto HDW previously owned which was covered, or that HDW told the insurance company within 30 days after it acquired the bus that it wanted coverage for the bus. The school bus was not used, and was not intended to be used, in HDW's business, which was sanitation and refuse hauling. Accordingly, the after-acquired automobile provision of the policy is not material to this dispute.

No riders, endorsements, or other documents have been presented to show that the written policy of auto coverage was ever changed to add the bus to those vehicles scheduled as covered. Accordingly, the court finds that the written contract of insurance did not expressly cover the bus. This brings the court to defendants' primary contention: that an oral contract of insurance was entered into which added the bus to the coverage provided in the written policy.

## II. Oral Insurance Agreement

Defendants' contention that the bus was added to the written policy by virtue of an oral contract of insurance is based primarily upon two factors: the representations of insurance agent Buetzer to HDW officer Allen; and Tri–State's past practice of adding additional autos to HDW's auto coverage under the written policy. Tri–State contends that Buetzer lacked authority to bind coverage on the bus, and that the terms of any oral agreement were not sufficiently definite to evidence a meeting of the minds. The court first addresses Buetzer's authority.

### A. *Authority of Agent*

Tri–State contends that Buetzer lacked actual and apparent authority to enter into an oral contract to insure the bus. Defendants contend that Buetzer had both actual and apparent authority to do so.

### Actual Authority

Tri–State alleges that Buetzer had no actual authority to agree to bind coverage on the bus unless an underwriter approved the addition of the bus to the policy.

*Tri–State Green Hills Contract*

■ Defendants allege Buetzer was an agent of Tri–State by virtue of the contract between those two. The document captioned "Agency Agreement" between Tri–State and Buetzer states the "Authority of Agent" is as follows:

The Agent is hereby granted authority: A. To solicit, receive, accept, bind, issue, countersign, or endorse insurance covering classes of risk for which commission is specified in Addendum "D" **unless otherwise limited by manual, letter of instruction, underwriting guide, or other written instructions.** Agent shall transmit copies of all evidence of insurance, applications, binders, copies of policies and endorsements issued, or otherwise notify Company of all liability accepted not later than the sec-

ond business day following inception of coverage.

(Dk. 133, Exh. 18, p. 2) (emphasis added). The Commercial Package Policy purchased by HDW is one of those included in Addendum "D," for which Buetzer had, by virtue of the "Agency Agreement," authority to bind or endorse insurance coverage, unless limited in writing. (Dk. 133, Exh. 18, Addendum D, p. 1).

■ Was Buetzer's authority "limited by manual, letter of instruction, underwriting guide, or other written instructions" from Tri–State? Tri–State believes that it was, relying upon a "Commercial Binding Guide" Buetzer received from Tri–State in an agent's manual, which states:

**Any Risk Not Specifically Listed Cannot Be Bound Without Underwriter Approval**

These limits are to be used as a guide. Please contact your underwriter for risks that exceed the guides or are not listed. The underwriter will discuss the nature of the risk and make a determination on binding risks with their approval.

(Dk. 130, Exh. 21). It is uncontradicted that HDW's business of refuse or sanitation hauling is not specifically listed in the guide as an approved type of risk, and was therefore a risk "not listed" in this guide. (*See id.*)

Buetzer testified, however, that he did not receive the manual from Tri–State which contains this commercial binding guide until after he had submitted HDW's initial application for insurance. That testimony is uncontradicted. Despite the fact that refuse hauling is not listed among "preapproved" types of risks, the policy was issued to HDW, and no dispute has arisen regarding the propriety of the initial issuance of the policy. Although Buetzer admits having received the commercial binding guide before the accident oc-

curred, (*See* Dk. 130, Exh. 5, p. 186), no evidence has shown that this guide was ever applied, or was even intended by Tri–State to be applied to an agent's determination whether to add a vehicle to a pre-existing policy. Accordingly, the limitation set forth in the commercial binding guide fails to raise a material question of fact regarding Buetzer's actual authority to enter into a verbal agreement to add a vehicle to a pre-existing policy.

■ Tri–State additionally relies upon deposition testimony from Buetzer, Granville, and Doug Sadler, an underwriter for Tri–State, to support the proposition that Buetzer could not agree to bind coverage on the bus before an underwriter approved its addition. Buetzer was asked:

Q. Now, when we have Symbol 7 applied for it is your understanding then under Tri–State's underwriting rules that you have to submit a memo or something to them in writing describing certain things about that vehicle before it can be added to the policy?

. . .

A. Well, the answer would be yes, yes. (Dk. 130, Exh. 5, p. 176 of Buetzer's depo.). However, in his affidavit, Buetzer states that he "understood that [he] had authority to bind coverage on an HDW vehicle being added to the Tri–State policy pending a final underwriting decision by Tri–State." (Dk. 133, Exh. 1, p. 6, ¶ 36).

Jackie Granville, an employee of Green Hills Ins. Services or Buetzer at the time, testified that when she prepared the memo to Tri–State requesting the addition of the bus dated September 15, 1999, (Dk. 130, Exh. 25), she assumed the bus would be covered, but understood then that she did not have the authority to add a vehicle to the HDW policy without underwriter approval. (Dk. 130, Exh. 8, p. 139–140 of Granville's depo.).

Sadler, Tri–State's underwriter, testified that Symbol 7 meant that the vehicles must be listed on the policy, that vehicles could be added to an existing policy, and that in order to make a decision whether or not to add a vehicle to an existing policy of commercial insurance, he would need to have certain information. (Dk. 130, Exh. 10, p. 36–38 of Sadler's depo.) That information included the identification of the vehicle, the use of it, the cost of the vehicle new if physical damage coverage was desired, the deductibles, photos for older units if physical damage coverage was desired, the VIN number, and the radius in which the vehicle would be driven on a normal basis. (Id.).

However, Sadler additionally testified that Buetzer did have authority to add motor vehicles to the Tri–State policy without preapproval from Tri–State for "like units," *i.e.*, those motor vehicles which were similar in nature to those used in HDW's business. Sadler stated that for motor vehicles which were not of like kind or were not going to be used for the same business purpose, Buetzer would need to contact the underwriter and discuss that with him over the phone before insurance coverage would be effective. (Dk. 133, Exh. 9, p. 78–80 of Sadler's depo.). Thus, Tri–State's policy, as applied, would have required Buetzer to contact the underwriter and discuss the addition of the bus to the policy before insurance coverage would be effective, because it was not a "like kind" vehicle.

Importantly, Sadler admitted that he did not know of any documents which Tri–State had ever provided to its agents notifying them that their binding authority is limited when the vehicle is not of "like kind" or is not going to be used for the same purpose for which the policy was originally written. (*Id.,* p. 128). No other evidence has pointed to the existence of any such document. Tri–State thus has not shown any "manual, letter of instruc-

tion, underwriting guide, or other written instructions" from it to Buetzer, as is necessary to limit Buetzer's authority, pursuant to the terms of the agency agreement.

In the absence of such written instruction from Tri–State to Buetzer, Buetzer's actual authority remains as stated in the agency agreement. Accordingly, Buetzer had the full authority broadly stated in the "Agency Agreement" to bind Tri–State "to solicit, receive, accept, bind, issue, countersign, or endorse insurance." (Dk. 133, Exh.18, p. 2); See Dk. 133, Exh. 18, Addendum D, p. 1. The court finds that Buetzer had actual authority to add the bus to the policy without prior approval from Tri–State.

This conclusion is supported in small part by the letter in which Tri–State first notified Buetzer that it refused to bind coverage on the bus, dated October 21, 1999. That document makes no allusion to any restriction on Buetzer's authority to bind coverage on the bus, but instead bases its rejection solely upon the nature of the vehicle, in stating: Tri–State "prefer[s] not to write this type of vehicle on this policy." (Dk. 133, Exh. 17, p. 1).

Given the evidence above, the court finds no material question of fact regarding Buetzer's actual authority. By virtue of his agency agreement with Tri–State, Buetzer had authority to bind coverage on the bus for the period of time from the date HDW requested such coverage until the date on which Tri–State denied coverage, which was after the date of the accident.

**Authority Pursuant to Missouri Statute**

Defendants further allege that Buetzer's authority as an agent of a foreign corporation is established by law in Missouri. Missouri RS § 375.901 requires foreign companies to transact business through licensed agents and brokers, in stating:

1. Foreign companies admitted to do business in this state shall make con-

tracts of insurance with persons in this state only by lawfully constituted and licensed agents and brokers.

Defendants rely upon cases decided when the above statute contained language which has now been deleted. Under the older version of the statute, § 6315, it was well established that a resident agent of a foreign insurance company could bind the company on an oral contract of insurance, regardless of the actual authority he was given. *Chailland v. M.F.A. Mutual Ins. Co.*, 375 S.W.2d 78, 82–83 (Mo.1964) (en banc) (holding resident agent of a foreign insurance company may bind his principal upon an oral contract of insurance, regardless of his actual authority, because statute requires that the agent countersign all policies issued); *Robinson v. Franklin Fire Ins. Co. of Philadelphia*, 225 Mo.App. 960, 35 S.W.2d 635 (1931) (finding local agency had authority to bind foreign insurance company by oral contract of insurance); *Foursha v. American Ins. Co.*, 224 Mo. App. 1071, 34 S.W.2d 552 (1931) (same); *McNabb v. Niagara Fire Ins. Co.*, 224 Mo.App. 396, 22 S.W.2d 364, 366–367 (1929) (one of the main purposes of § 6315 was "to put a stop to the irritating and unjust practice indulged in by some insurers of adroitly phrasing their agency contracts in a way to bestow general powers on their agents, who come in direct contact with the public, when such powers relate to benefits flowing to the company, and to invest such agents with no power to represent the company when the benefits of the insured are involved.)"

The cases above which have found that resident agents of foreign corporations have the power to bind the company by oral contracts to insure have focused upon the countersigning requirement of the statute. Now, however, the relevant statute no longer requires local agents of foreign corporations to countersign all policies. Case law sheds little light upon the

scope of the authority vested in an insurance agent of a foreign corporation pursuant to the current statute. The parties have not analyzed the effect of the statutory change, and the court declines to do so. Thus, although it is possible that as the resident agent of a foreign insurance company, Buetzer was vested with authority to bind the company to an oral contract of insurance regardless of his actual authority, the court need not decide the issue.

**Apparent Authority**

 Defendants additionally contend that Buetzer had apparent authority to enter into an oral agreement to insure the bus. Under Missouri law, "an agent with authority to execute a written binder also has authority—at least apparent authority—to enter into an oral binder." *Chailland*, 375 S.W.2d at 82. Apparent authority does not exist, however, where the client is aware of the limitation on the agent's authority. *See Halbrook v. Atlas Life Ins. Co.*, 234 S.W.2d 628, 638 (Mo.Ct. App.1950).

No contention is made that HDW was apprized that Buetzer lacked authority to orally bind the company to insure the bus. Instead, the testimony is uncontradicted that on two or more separate occasions prior to the date of the accident, Tri–State added a vehicle to HDW's policy pursuant to HDW's oral request to Buetzer to do to. (Dk. 133, Exh. 1, p. 6, ¶ 37; Dk. 133, Exh. 2, p. 2, ¶ 9). Each time coverage was effective as of the date of Buetzer's oral assurance to HDW. (Dk. 133, Exh. 1, p. 6–7, ¶ 36,42; Dk. 133, Exh. 2, p. 3, ¶ 14). At some later date, HDW's premium would reflect the change, although no written additions or deletions were made to the list of autos scheduled in the original policy. (Dk. 133, Exh. 1, p. 6, ¶ 39, 53; Dk. 133, Exh. 2, p. 2, ¶ 9, 16). From this course of dealing between the parties, HDW had no reason to question Buetzer's authority to add a vehicle to coverage, effective the day of HDW's request.

Granted, a bus is not a semi or a tractor, was not used in the course of HDW's business, was not going to be driven locally, and thus appears to be different in kind than the other HDW vehicles Tri–State added to the policy after its initial effective date. However, no evidence suggests that HDW had any reason to believe prior to the date of the accident that any "like kind" limitation existed on Buetzer's authority to add a vehicle to the policy. Buetzer was himself unaware of any such limitation. Buetzer's apparent authority is unaffected by the limitation on Buetzer's authority underwriter Sadler testified to, which was not conveyed to HDW.

In sum, the court finds that whether by virtue of actual or apparent authority, Buetzer had the legal capacity to bind Tri–State to an oral contract of insurance, and specifically to add the bus to the policy.

**B. *Terms of the Agreement***

 Tri–State next alleges that the terms of Buetzer's oral agreement to insure the bus are not sufficiently definite to establish an enforceable oral contract of insurance.

 The parties agree that the controlling law provides:

It appears to be well settled in Missouri, and generally, that oral contracts of insurance are valid. In order to establish an enforceable oral contract of insurance, there must be a meeting of the minds of the parties thereto on the essential elements of the contract, which are, subject matter, risk insured against, amount of risk, duration of risk, and premium. (Citations omitted). It is not essential that all the elements of a contract be expressly agreed upon if the intention of the parties to the contract

can be gathered from the circumstances of the case. (Citations omitted).

*American Surety Co. of New York v. Williford,* 243 F.2d 494, 499 (8th Cir.1957).

Tri–State concedes that Allen and Buetzer agreed upon the subject matter of insurance of the bus, but disputes the remaining elements.

Defendants allege that any terms not expressly discussed between HDW and Buetzer were supplied by the original automobile policy, to which the bus was merely being added. Because the type of risk, the amount of liability coverage, and the duration of the coverage were established in the original policy, and HDW sought merely to apply those same terms to an additional vehicle, and not to alter any other terms of the policy or to create a new contract, the rule requiring a meeting of the minds on the requisite elements should be relaxed.

■■■ This approach finds some support in decisional law. Missouri recognizes that agreements to renew an insurance policy need not be as definite in their terms as does an initial agreement to insure. In *Massachusetts Bonding & Ins. Co. v. R.E. Parsons Electric Co.,* 61 F.2d 264, 268 (8th Cir.1932), the circuit quotes with approval the following excerpt from 15 A.L.R. 1011:

> "It is generally held that agreements to renew need not be as definite as to terms as an agreement to issue a policy, since the agreement will be presumed to have reference to the terms of the existing policy, and these agreements have been upheld where there was no specific agreement as to terms."

There, the court stated:

> It is, of course, elementary that the court cannot make a contract for the parties. In order to have an enforceable contract of insurance, there must be a meeting of the minds of the parties on the essential elements of the contract. But, in the instant case, the parties

agreed to renew a policy that was then in full force and effect. The proof of an oral contract of original insurance is not involved. It will be presumed, unless a contrary intention appears, that the parties intended to adopt in the renewal policy the terms and conditions of the expiring policy.

61 F.2d at 268; *See Williford,* 243 F.2d 494, 499 (finding it "clear that the parties contemplated that the appellant would provide the same coverage as did their existing policy, thus, the existing policy supplies the information as to the terms of the policy contracted for.").

■■■ Although the case law above relates to renewals of insurance contracts, the court believes that the same presumption would apply under Missouri law when an insured seeks to add a vehicle to an existing policy. Therefore, no contrary intention appearing, the agreement to add the bus will be presumed to have reference to the terms of the existing policy, and such an agreement can be upheld despite a lack of a specific agreement as to terms.

Application of this rule is particularly appropriate in this case based upon the course of dealing of the parties. No evidence shows that specific terms were discussed on those occasions prior to the date of the accident when HDW asked Buetzer to add a vehicle to its existing policy, and Buetzer did so. Instead, the endorsement memos reflecting those requests refer to "same coverages," (Dk. 133, Exh. 15, Bates no. 2659), or list "Liability, Med Pay, UM, UIM," (Dk. 133, Exh. 15, Bates no. 2633), which are the same coverages included in the original policy, but for the physical damage coverage. (See Dk. 133, Exh. 16, p. 1–2 of Business Auto Coverage Form Declarations). Therefore, the risk insured against, the amount of risk, and the duration of risk, if not otherwise established by

agreement of the parties, were all as established in the original policy.

Further, it is uncontested that Williams told Buetzer in August of 1999 that he wanted liability, medical pay, and uninsured motorist coverage on the bus. (Dk. 147, Tri–States' facts no. 43, 45, uncontested by defendants). Buetzer understood that Williams did not want physical damage or comprehensive coverage on the bus, and wanted limits of $500,000 or a million dollars. (*Id.*). Although Buetzer did not know the length or precise dates of the bus trip, he did know that HDW wanted trip insurance for the bus. (Dk. 147, Tri–States' facts no. 40–42, 47, 49–51, uncontested by defendants). Thus even absent the presumption provided by law, the terms of the agreement were sufficiently definite.

 Nor is the fact that no premium amount was agreed to at the time fatal. The evidence is uncontested that on those occasions prior to the date of the accident when HDW asked Buetzer to add a vehicle to its existing policy, no premium payment was agreed upon or made until HDW received a bill reflecting the change at a later date, approximately 30 days thereafter. (Dk. 133, Exh. 1, p. 2, ¶ 9). Such conduct evidences an implied agreement to pay the usual or customary premium or to enter into a contract upon credit. *See Williford,* 243 F.2d at 501, and cases cited therein.

In light of all the circumstances of the case, the court finds no material question of fact precluding the determination that the terms of the oral agreement to insure the bus were sufficiently definite to constitute a meeting of the minds.

 Tri–State contends that it did not receive the written endorsement from Buetzer until after the accident. This fact, even if true, is immaterial because under Missouri law, the knowledge of the agent is imputed to the company. *See American*

*Family Mut. Ins. Co. v. Bach,* 471 S.W.2d 474, 479 (Mo.1971). "An insurance company, as an artificial legal person, can have no knowledge of any facts except as the knowledge of its various officers and agents is imputed to it." *State ex rel. John Hancock Mut. Life Ins. Co. v. Hughes,* 152 S.W.2d 132, 134 (Mo.1941). *See Jenkad Enterprises, Inc. v. Transportation Ins. Co.,* 18 S.W.3d 34, 37–38 (Mo. Ct.App.2000). It is uncontested that Buetzer knew of HDW's request to add the bus to coverage before the accident, and that Buetzer told HDW, by stating "OK," that coverage was effective as of the date of that conversation, as was their past practice.

The court thus finds that Buetzer not only possessed the authority to enter into an oral agreement to insure the bus, but also that Buetzer did enter into such an agreement prior to the date of the accident, the terms of which were sufficiently definite to establish an enforceable oral contract of insurance.

### III. Agreement Void Ab Initio

Tri–State next contends that any oral agreement to insure the bus was void *ab initio* because of material misrepresentations.

*Terms of Policy re: Concealment and Misrepresentation*

Tri–State alleges that HDW concealed and/or misrepresented certain information from it in the process of applying for the initial policy of insurance, *see* Dk. 147, p. 34, and appears to use the terms "conceal" and "misrepresent" interchangeably in its memorandum. *Id.*

 The insurance policy expressly establishes the conditions under which its coverage will be void due to misrepresentation, concealment, or fraud. It provides

at § B2 of the Commercial Auto Policy, Business Auto Coverage Form:

> This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:
>
> a. This coverage form;
>
> b. The covered "auto";
>
> c. Your interest in the covered "auto"; or
>
> d. A claim under this Coverage Form.

(Dk. 133, Exh.16, Commercial Auto Policy, Business Auto Coverage Form, p. 8 of 11).

Tri–State appears to tacitly contend that the term "intentionally" as used above modifies only the verb "conceal," and not the verb "misrepresent." Such a construction would permit the insurance company to void the contract upon a showing of intentional concealment, unintentional misrepresentation or intentional misrepresentation. No reason for such a distinction has been alleged or is apparent to the court. It is well established under Missouri law that "an interpretation of a contract or agreement which involves unreasonable results, when a probable or reasonable construction can be adopted, will be rejected." *Jackson v. Christian Salvesen Holdings, Inc.,* 978 S.W.2d 377 (Mo.App. E.D.1998) quoting *State ex rel. Mo. Dam and Reservoir Safety Council v. Rocky Ridge Ranch Property Owners Ass'n,* 950 S.W.2d 925, 929 (Mo.Ct.App. 1997). "A construction which attributes a reasonable meaning to all the provisions of the agreement is preferred to one which leaves some of the provisions without function or sense." *Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 718 (Mo.Ct. App.1995).

To require the insurer to void the contract only upon a showing of intentional concealment, but to permit the insurer to void the contract upon a showing of a unintentional misrepresentation would produce an unreasonable result. It is more reasonable to construe the policy of insurance as requiring that whether the insured's act is one of commission (misrepresentation) or of omission (concealment), intent must be shown before the policy can be voided on that basis.

This result would be the same even if the court considered the policy language to be ambiguous, *i.e.,* reasonably open to different constructions, because "ambiguous terms are construed against the insurer." *Causey v. Medical Life Ins. Co.,* 21 S.W.3d 24, 30 (Mo.Ct.App.2000). The court would thus require Tri–State to bear the heavier burden of proving intentional concealment or intentional misrepresentation by the insured, before voiding its policy.

The parties devote arguments to whether intent is generally required under Missouri law as a prerequisite to voiding a contract issued upon misrepresentations, but the court finds it unnecessary to decide this academic issue in light of the unambiguous and binding terms of the contract set forth above. *See Krombach v. Mayflower Ins. Co., Ltd.,* 827 S.W.2d 208, 210 (Mo.1992) (finding "where insurance policies are unambiguous, the rules of construction are inapplicable, and absent a public policy to the contrary, the policy will be enforced as written."). Under those terms, Tri–State must show that an insured intentionally concealed or intentionally misrepresented a material fact concerning one of the four matters listed. *Misrepresentation of Ownership of Non-Insured Vehicles*

Tri–State alleges that HDW misrepresented the material fact that it did not own vehicles other than those insured under the policy. It is undisputed that the application for insurance asks, on its preprinted form:

"13. Any vehicles owned but not scheduled on this application?" (Dk. 130, Exh. 20, 16th unnumbered page). In response to this question, Buetzer typed "N," meaning "no." (Id.).

However, Buetzer and Allen both testified that when Allen signed the application form after Buetzer completed it, she had not seen or read the form, and that Buetzer forwarded to her only the signature pages, which she signed and returned. (Dk. 136, Exh. 5, p. 97–100; Id., Exh. 8, p. 119–121). The sole evidence plaintiff shows to the contrary consists of a craftily worded question by plaintiff's counsel, which produced vague testimony by Allen, which could be read as stating that Allen had received the entire application before signing it. This potential misunderstanding was clarified by Allen's counsel on cross-examination, and her testimony is thus completely consistent in stating that she had only seen the signature page of the application prior to the commencement of this case.

No evidence has shown that Allen had any reason to know that the application's question about owned, unscheduled vehicles had been answered erroneously. Accordingly, Tri–State cannot show that HDW, the insured, made a material misrepresentation by virtue of any information on the application form.

Tri–State next attempts to show that Allen made verbal misrepresentations to Buetzer about other vehicles owned by HDW which caused Buetzer to complete the written application in error.

Affidavits from the two individuals directly involved, Kim Allen, H.D.W.'s officer in charge of obtaining insurance for the company, and Doyle Buetzer, the insurance agent who solicited H.D.W.'s business at that time, are consistent. Allen's affidavit states that when she applied on behalf of the company for insurance, she provided Buetzer with a complete asset list of property owned by HDW, including the 1979 bus. (Dk. 136, Exh. 6, p. 5, ¶ 28). Buetzer's affidavit states that in September of 1998, HDW made him aware that it owned some vehicles that it did not want insured. (Dk. 126, Exh. 10, p. 2, ¶ 8, 12). Thus, according to these affidavits, in 1998 when HDW applied for and obtained commercial auto coverage from Tri–State, HDW did not wish to insure the bus but nonetheless made Buetzer aware that HDW owned it.[1] Buetzer's knowledge is imputed to the company. *See American Fire & Indem. Co. v. Lancaster,* 415 F.2d 1145. (8th Cir.1969).

Tri–State attacks the above affidavits as sham affidavits which contradict facts established in the parties' previous depositions. Defendants make no response to the substance of this issue, choosing instead to dismiss it as an unsubstantiated challenge to counsel's character, rather than to the admissibility of the evidence. *See* Dk. 149, p. 12.

In assessing a conflict under these circumstances, the court should disregard a contrary affidavit only if it constitutes an attempt to create a sham fact issue. *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986); *Bohn v. Park City Group, Inc.,* 94 F.3d 1457, 1463 (10th Cir.1996). The rationale underlying such decisions is that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his

---

**1.** There is no material question as to why the bus was not listed among the autos covered in the written policy. It is undisputed that Terry Allen, Kim's husband and the general manager of HDW, did not want to pay insurance premiums on vehicles that were not actually used in the business.

own prior testimony. *Franks,* 796 F.2d at 1237.

Factors relevant to the existence of a sham fact issue include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.*

The crucial issue is whether Allen contradicts her own testimony about her disclosure to Buetzer during the application process that HDW owned vehicles it did not wish to insure.

In her September 15, 2000 deposition, the following colloquy appears:

Q. In October of 1998 were there vehicles owned by HDW Enterprises and on your premises that you did not seek insurance for?

A. Yes

. . . .

Q. And did you tell Buetzer that and that is that we have vehicles that we own but that we don't want insurance on?

A. No.

Q. Did you simply tell him these are the vehicles we want insurance on and list them to him or give him a list of those vehicles?

A. I gave him the list of the vehicles that we were *using.*

(Dk. 130, Exh. 2, p. 53–55, Allen's Sept. 15, 2000 depo.) (emphasis added). Allen was later asked:

Q. Did you disclose at any time during this initial meeting with Mr. Buetzer that HDW had this 1979 IHC bus?

A. No.

(Id., p. 69).

Allen's testimony in her September 15, 2000, deposition squarely contradicts Allen's affidavit, which states that when she applied on behalf of HDW for insurance, she provided Buetzer with a complete asset list of property owned by HDW, including the 1979 bus. (Dk. 136, Exh. 6, p. 5, ¶ 28). In a subsequent deposition taken December 27, 2000, Allen testified during cross-examination that when she spoke with Buetzer in the fall of 1998, she told him about all the vehicles that HDW *owned,* and "held nothing back." Allen's testimony in her later deposition is consistent with her affidavit.

Allen was cross-examined when she gave her earlier testimony, and as a participant in the alleged conversations she clearly had access to the relevant evidence at that time. Moreover, her affidavit makes no reference to her earlier contrary statements, and her earlier testimony is unequivocal. Here, however, even if the court were to decide that this is one of those unusual cases in which the conflict between the testimony and the affidavit raises only a sham issue and that Allen's affidavit should be disregarded pursuant to *Franks,* the court is left with Allen's two contradictory deposition statements, one in September and another in December.

The court will read the record in the light most favorable to Tri–State, and presume that Allen disclosed to Buetzer only those vehicles HDW used, rather than all it owned, and did not disclose its ownership of the bus at the time HDW applied for insurance. The court thus considers whether those misrepresentations, if any, were "material," within the meaning of that term in the policy, which requires the concealment or misrepresentation of a material fact to void the policy.

Tri–State asserts that "Tri–State may not have issued the policy if the owned but non-insured vehicles had been shown, and HDW refused to pay an additional premium . . ." (Dk. 147, p. 9, ¶ 21.) In support of

this contention, Tri–State points solely[2] to the following testimony by some individual named Pamela Lassen:

Q. Now, you also state in your supplemental report that it's your belief that insurance companies like Tri–State may not have issued the policy to H.D.W. if additional vehicles had been disclosed, but H.D.W. did not pay a premium for coverage for the additional vehicles. Are you saying you can have a situation where if not all of the owned vehicles are covered, then either the policy will not be issued or there's going to be an issuance of the policy at a higher premium?

A. The company is going to dictate how they're going to handle that. It's not up to the agent to determine what the company's going to do.

(Dk. 130, Exh. 9, P. 42). To the extent the question above purports to be testimony by the attorney asking the question, it is inadmissible. Further, the referenced report that the attorney refers to is not included in the record before this court. Thus the sole evidence proffered by Tri–State on this issue is the response given by Lassen.

Lassen's testimony is simply that the insurance company, and not the agent, will decide how to handle a situation where not all the owned vehicles are covered. This unremarkable statement falls far short of showing the materiality of an insured's failure to disclose that they own vehicles for which they do not seek coverage. Counsel has not attempted to explain how the fact that an insured owns vehicles that it does not wish to insure has any relation whatsoever to the risk insured against, or is otherwise material to the decision whether to issue coverage, or even to the determination of what the amount of the

premium should be for other vehicles that are covered. Plaintiff has thus failed to raise a material question of fact regarding material, intentional concealment of HDW's ownership of non-insured vehicles.

*Concealment of Texas Vehicles*

Tri–State additionally contends that HDW concealed or misrepresented material facts by indicating on the application that all of the vehicles listed on the schedule were used locally, within a 50-mile radius of HDW's business in Missouri. It is uncontested that two or three scheduled vehicles were not primarily operated locally, but were used the majority of the time in Texas or Mexico by Harvey Williams, the principal shareholder of HDW. It is further uncontested that the application form covers those vehicles used by Williams in Texas, and that the form indicates by the notation "L" that such vehicles are used locally.

As noted above, it was Buetzer, not HDW, who completed the application form. HDW never saw the application form, as completed by Buetzer, prior to involvement in this litigation. Although HDW signed the application form, only the signature pages were forwarded to HDW, and it had no knowledge of the contents of the application package. Thus Tri–State cannot show the HDW misrepresented or concealed anything merely by virtue of having signed the application.

The record fails to support the assertion that HDW caused or contributed to Buetzer's listing those vehicles used by Williams as local. Instead, both Buetzer and Allen, the primary individuals involved in the application process, agree that Allen told Buetzer that Williams was in Texas and was using some of the scheduled vehi-

---

**2.** Other citations to the record are offered, but they relate solely to the vehicles operated in

Texas or Mexico, not to this issue.

cles there. (See Dk. 136, Exh. 8, Buetzer depo. p. 107–109; Dk. 136, Exh. 6, Allen affidavit ¶ 6–8). No contrary evidence has been presented. Accordingly, the court finds no material question of fact regarding a misrepresentation by the insured involving the location in which the scheduled vehicles would be operated, and need not reach other issues including intent and materiality.

No material question of fact has been presented that any insured intentionally concealed or misrepresent a material fact concerning the coverage form, covered autos, the insured's interest in the covered autos, or a claim under the coverage form. Therefore, Tri–State cannot show that the written policy of insurance is void *ab initio*, or that the terms of the written policy cannot be incorporated into an oral contract to insure the bus. Otherwise stated, no reasonable finder of fact could conclude that the insurance policy at issue is void due to intentional misrepresentations or concealment of material facts by the insured.

## IV. Insurable Interest in Bus

Lastly, Tri–State contends that HDW lacks an insurable interest in the bus because HDW did not have a valid certificate of ownership for the bus at the time of the accident. It is uncontested that the certificate of ownership for the bus was signed by the seller, and delivered to HDW soon after the seller received payment for the bus, at a time relatively contemporaneous to the purchase. It is further agreed, however, the seller did not indicate on the title who the bus was being assigned to, and HDW did not complete the back of the title or make any attempt to register the title until after the accident. (*See* Dk. 130, Exh. 27, showing back of title between purchase date of Sept. 28, 1996, and date of accident; Dk. 130, Exh. 25, showing application date for title as Nov. 30, 1999). The sole items completed on the back of the certificate at the time of the accident were the seller's name and the seller's signature.

HDW counters that it did in fact own the bus at the time of the accident, that even if it did not own the bus it had an insurable interest in the bus, and that at any rate, vehicle coverage under the policy was not premised upon ownership.

*Ownership/Title*

Missouri law requires, for a change of ownership of a motor vehicle, that the holder endorse an assignment of title and deliver it to the other party at the time of transfer. Tri–State alleges that the terms of the following statute regarding the sale and transfer of vehicles were not complied with:

1. In the event of a sale or transfer of ownership of a motor vehicle or trailer for which a certificate of ownership has been issued, the holder of such certificate shall endorse on the same an assignment thereof, with warranty of title in form printed thereon, and prescribed by the director of revenue, with a statement of all liens or encumbrances on such motor vehicle or trailer, and deliver the same to the buyer at the time of the delivery to him of such motor vehicle or trailer ...

RSMo. § 301.210 (1997). See also subsection 4 of same statute (making it unlawful for any person to buy or sell in Missouri any motor vehicle or trailer registered under the laws of Missouri, unless, "at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as provided in this section, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void.")

Neither party has cited any case law interpreting the statute's requirement that

the holder of such certificate "shall endorse on the same an assignment thereof." Arguably, the seller, as the holder, did endorse on the certificate of title an assignment thereof by signing his name to the document and sending the certificate to the purchaser. *See* Black's Law Dictionary, 6th Ed., p. 774 (defining "indorsement" as "the act of a ... holder of a negotiable instrument, in writing his name upon the back of the same, with or without further or qualifying words, whereby the property in the same is assigned and transferred to another."). The opposite conclusion could just as easily be reached, however, given the fact that numerous items were left blank in the "Assignment" section on the back of the certificate, including the date of sale, the purchaser's name and address, the odometer reading, and a notarization. (*See* Dk. 130, Exh. 32, last page). The sole items completed on the back of the certificate were the seller's name and the seller's signature. (*Id.*)

 But even if the terms of the statute were not complied with, Tri–State has not shown that a defect in the certificate of title for the bus would preclude valid insurance on the bus. Missouri law holds that a seller's failure to fully comply with the assignment of title requirements does not defeat insurance coverage. In *American Economy Ins. Co. v. Paul*, 872 S.W.2d 496, 499 (Mo.Ct.App.1994), the court held that the legislature's passage of the Motor Vehicle Financial Responsibility Law indicates that a seller's failure to fully comply with the assignment of title requirements should not operate to defeat the acquisition of title or insurance coverage. *Liberty Mutual Ins. Co. v. IGF*, 888 S.W.2d 757, 759 (Mo.Ct.App.1994). *Cf., Antle v. Reynolds*, 15 S.W.3d 762 (Mo.Ct.App.2000) (statute declaring sale of motor vehicle without transfer of title to be illegal and void did not preclude buyer of vehicle from maintaining claims under Merchandising Practice Act, common law fraud, or Truth in Lending Act against seller of motor vehicle, even though there was no contemporaneous assignment of certificate of title.) Nor has any policy reason been shown why a defective title to the bus should have any impact upon HDW's ability to secure insurance for the bus.

This is particularly so where as here, coverage under the policy is premised not upon ownership of the vehicle, but solely upon the vehicle's being specifically included on the list of scheduled vehicles. *See* Dk. 136, Exh. 19, ("Business Auto Coverage Form,"). The "Business Auto Coverage Form" for HDW's policy lists nine available symbols, which designate which vehicles are covered. Symbol 1 means "any auto." Symbols 2–6 are certain "owned autos." Symbol 7, the coverage all parties agree HDW had, makes no reference to owned autos, but restricts its coverage to "those 'autos' described in ITEM THREE of the Declarations for which a premium charge is shown ..." Here, no reason based upon the applicable insurance policy or upon public policy has been shown why the defective title to the bus, if any, should have any impact upon HDW's ability to obtain insurance for the bus.

*Insurable Interest*

 Further, under Missouri law, it is possible to have an insurable interest in property without having valid title thereto:

In general, a person has an insurable interest in the subject matter insured where he has such a relation or concern in such subject matter that he will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction, termination, or injury by happening of the event insured against. *G.M. Battery & Boat Co.*, 747 S.W.2d at 626. An insurable interest in property "may be a special interest entirely disconnected from any title, lien, or possession." The

issue is not what is the insured's title to the property, but rather, would she suffer pecuniary damage by its loss. Thus, an insurable interest "may be derived from possession, enjoyment, or profits of the property, security or lien resting upon it, or it may be other certain benefits growing out of or dependent upon it." *DeWitt,* 667 S.W.2d at 705 (quoting *American Cent. Ins. Co. v. Kirby,* 294 S.W.2d 556, 561 (Mo.App.1956)). Also, "[i]t is not necessary, to constitute an insurable interest, that the interest would be such that the event insured against would necessarily subject the insured to loss; it is sufficient that it might do so, and that pecuniary injury would be the natural consequence...." *G.M. Battery & Boat Co.,* 747 S.W.2d at 626.

*Gorman v. Farm Bureau Town & Country Ins. Co. of Missouri,* 977 S.W.2d 519, 526 (Mo.Ct.App.1998).

HDW had exclusive possession of the bus at the time of the accident. It has not been shown that anyone had better title to the bus than HDW did at the time of the accident. The bus was operable, was a traditional school bus, and was full of desks at the time of the accident. It thus had some pecuniary value to HDW such that injury to HDW would be the natural consequence of an accident involving damage to the bus or its contents. In accordance with Missouri law, the court thus finds that even if HDW did not have good title to the bus at the time of the accident, HDW had an insurable interest in the bus.

For all the reasons set forth above, the court finds that summary judgment in favor of the defendants is warranted.[3]

## Motion for Review of Magistrate's Order (Dk. 109).

Tri–State has filed a motion for review of the magistrate's order filed February 12, 2001, which granted defendant's late motions for a jury trail. In light of the court's grant of summary judgment, this motion for review is denied as moot.

## Motion for Determination of Place of Trial. (Dk. 118).

Unable to agree as to whether the trial of this case should be held in Topeka or in Kansas City, the parties have asked this court to decide the issue. In light of the court's grant of summary judgment, this motion is moot.

IT IS THEREFORE ORDERED that Tri–State's motion for summary judgment (Dk. 127) is denied, and that defendants' motions for summary judgment (Dk. 132, 135 & 138) are granted.

IT IS FURTHER ORDERED that the motion for review of magistrate's order (Dk. 109), and the motion for determination of place of trial (Dk. 118), are denied as moot.

---

**3.** Although defendants have not filed cross-motions for summary judgment, they have requested a grant of summary judgment in their favor in their respective briefs. See Dk. 132, p. 1, 39; Dk. 148, p. 1, 38. The Pretrial Order indicates that defendants agreed not to file their own motions for summary judgment "in an attempt to lessen the burden of the Court and all counsel in dealing with cross-motions for summary judgment." (Dk. 126, p. 30). In accordance with the language of the pretrial order, the court will construe defendants' responses to Tri–State's motion for summary judgment as cross-motions for summary judgment.