**Albert JACKSON, Trustee, etc., et al., Plaintiffs/Appellants/Cross– Respondents,**

v.

**CHRISTIAN SALVESEN HOLDINGS, INC., et al., Defendants/Respondents/Cross–Appellants.**

**Nos. 72665, 72810, 72795 and 72809.**

Missouri Court of Appeals, Eastern District, Division One.

July 31, 1998.

Application for Transfer Denied Nov. 24, 1998.

---

Green, Schaaf & Margo, P.C., Martin M. Green, Joe D. Jacobson, Clayton, Clayton, for appellant.

Goldstein and Price, L.C., Gary T. Sacks, Douglas E. Gossow, Evans & Dixon, L.L.C., St. Louis, for respondent.

PUDLOWSKI, Judge.

Albert Jackson, as trustee of the Jackson Family Trust, Kenneth Ray Jackson and Connie Sue Jackson (collectively, "Jackson") brought suit against Christian Salvesen Holdings, Inc. ("Holdings") claiming a breach of a Buy–Sell Agreement and its reformation. Albert Jackson (individually, "Albert") also sought relief from Holdings and two of its employees based on allegations of slander. Holdings moved for and was granted a separate non-jury trial on the reformation claim. The trial court denied Holdings's claim and adopted Jackson's findings of fact and conclusions of law verbatim in its order. Holdings appealed, but this Court dismissed the appeal as premature for lacking a final judgment. *See Jackson v. Christian Salveson Holdings*, 914 S.W.2d 878 (Mo.App. E.D. 1996). Following the bench trial, all remaining contract and defamation claims were tried before a jury. The jury found for Holdings on the contract claim and for Albert on the defamation claim. The trial court entered judgment accordingly and awarded attorney fees to Holdings pursuant to the original Buy–Sell Agreement. This consolidated appeal follows. We affirm in part and reverse in part.

This case arises from the sale and purchase of a trucking company. In 1988, Christian Salvesen, Inc. ("CSI"), a refrigerating warehouse, wanted to expand its business by acquiring a trucking company. A CSI manager approached Albert Jackson to inquire if he would be interested in selling his trucking company, SEMO Transportation Company ("SEMO"). When Albert responded favorably, negotiations began.

THE CONTRACT CLAIM

SEMO was jointly owned by Steve Henry ("Henry") and Jackson. SEMO had a total of 500 shares of stock issued and outstanding. Henry and Jackson each owed 250 shares of SEMO stock. Albert was the active manager of both the business and the trust. CSI offered to buy them both out. Henry accepted this offer and sold CSI his entire interest in SEMO. Jackson, however, did not want to sell its stock outright due to tax liability and Albert's prediction that the stock would increase in value following CSI's acquisition. Therefore, CSI and Jackson agreed that a portion of Jackson's stock would be purchased immediately, Albert would remain with the trucking company as a manager, and that Holdings would buy out all of Jackson's stock over a four year period. Negotiations then turned to the pricing formula which would be used to acquire Jackson's stock.

CSI's senior vice president, Cyriel Godderie ("Godderie"), began discussions of the stock purchase price with Jackson. Godderie introduced the concept that Jackson's stock purchase price could be linked to the company's profits. This concept appealed to Jackson's desire to retain the stock after the company's purchase in order to capture its increased value and to Holdings's desire to give Albert an incentive to run a profitable company.

The purchase formula was created to reflect the company's operating profit and to eliminate specific financial items which would not reflect the quality of the manager's performance. Thus, the purchase price for each installment would be a multiple of the company's "Pre–Depreciation Surplus" less the company's average debt. This was the same method used to purchase Henry's stock and the first installment of the Jackson stock.

On 18 August 1988, following the initial discussion regarding purchase price, several members of CSI met with Albert in his office

to explain the terms of the formula. CSI wanted to retain Albert as a manager for an indefinite period of time and thus, wanted to be sure that he understood and was satisfied with the purchase agreement. They reiterated that the purchase price would measure the profitability as the primary factor in the equation. Albert agreed stating this would be desirable for him in that he could increase the purchase price if he could increase the profitability of the company. Several scenarios were illustrated to him showing the effect of average debt on the purchase price. CSI encouraged Albert to seek professional advice regarding the formula. This then became the agreed pricing formula for the Buy–Sell Agreement.

After this meeting, both parties negotiated regarding the multiple to apply to the formula. Albert, believing the company would be worth more during its third year, negotiated a higher multiple for the final year that the formula would be in effect.

The documents regarding the Buy–Sell Agreement were drafted according to the parties's previous discussions. Following the initial draft, Holdings reworded the Buy–Sell formula to make it easier to use without changing the formula with which Jackson's stock would be purchased. During the modification of the Buy–Sell Agreement purchase price formula, the word "interest" which originally modified "expense" was omitted. However, all of the interested parties, including but not limited to Albert, Kenneth Ray Jackson and Connie Sue Jackson, both individually and as statutory trustees of Jackson Farms, Inc., signed the documents transferring SEMO to Holdings.

Albert remained as a manager with Holdings and in October 1989 was presented with a check for the first installment purchase of 50 shares of stock. The calculation as written within the Buy–Sell Agreement would have yielded a purchase price of $17,425 payable to Jackson. However, Holdings utilized the formula which was discussed rather than the one written in the Buy–Sell Agreement. Holdings added several items back into the post-tax profit yielding a purchase price of $37,725. Gary Calise ("Calise") presented Jackson a check for this amount along with a

description of how he arrived at the figure and an acknowledgment stating that the sellers agreed with the computation therein. Albert, Kenneth Ray Jackson and Connie Sue Jackson, signed the acknowledgment and endorsed this check.

Albert later expressed disappointment with the amount of the first-year purchase price to Calise, but did not dispute the method of calculation. Godderie also spoke to Albert regarding his disappointment to bolster his efforts and reiterate that the formula was dependent on Albert's effort at Holdings. Godderie supported Albert's position within the company. Albert's salary increased.

During the next year, the company's performance diminished significantly and due to Albert's poor performance he was terminated in September 1990. When applying the formula to purchase the next 50 shares of stock, the pre-depreciation surplus number was negative and thus, Jackson was paid $1 as required by their agreement. Again in the third buy out period, the pre-depreciation surplus was negative and the stock shares were purchased for $1. In the final installment, 1991–1992, CSI went out of business resulting in a $1.3 million loss to Holdings. The trust failed to transfer the remaining shares of SEMO to Holdings per their agreement.

Jackson brought suit against Holdings alleging a breach of its Buy–Sell Agreement in payment for the acquisition of SEMO stock.

### THE TORT CLAIM

Albert's slander claim arises during the period beginning in the fall of 1990 and continues through the filing of his petition on 6 May 1991. Albert claims that CSI, Calise and Bradley Feinberg ("Feinberg") made slanderous statements regarding Albert which caused him harm.

Pursuant to the Buy–Sell Agreement, Henry and Jackson were responsible for payments of tax liabilities accruing prior to 15 September 1988, the closing date. As manager, Albert received notice from the State of Kentucky, Division of Motor Carriers notifying him that the 1 October 1986 to 30 September 1989 audit of the use tax records revealed an underpayment of $12,585.72.

Only a small portion of this amount would be attributable to Holdings, the larger portion attributable to SEMO prior to the closing date.

Albert talked with the Kentucky authorities regarding the tax bill and convinced them to forgive penalties and interest and to accept $9,000 as the total liability. Rather than sending the bill to Albert's superiors, Albert paid it in $500 installments from the company's coffers. Albert had authority only to issue checks from the company in the amount of $500 or less.

Albert and his son, Travis, were both employed as Holdings employees. In December 1989, they formed a company d/b/a JFT Transport ("JFT"). JFT owned ten trailers titled in Albert and Travis's names. JFT operated out of Travis's home. JFT leased its trailers to operators who in turn leased the JFT trailer and a private tractor to Holdings. This arrangement earned JFT ten percent of the gross revenue on the trip when its trailer was used. When leasing to Holdings, Albert would sign the lease agreement on behalf of JFT even though he was a Holdings general manager. Albert never informed anyone at Holdings that he and Travis leased trailers to the company.

Later, Albert, Travis and Dennis Carlyle formed Transport Company. Transport Company purchased two trailers and titled them in all three names. These trailers also were leased to Holdings under an arrangement where Transport Company received eighty-two percent of the gross revenue from each trip. Albert did not inform Holdings of his involvement with Transport Company.

Holdings has a policy requiring employees who have a personal business relationship with any of its vendors or customers to disclose this relationship to a supervisor. The vice president of human resources at Holdings sent a copy of this policy to Albert several times and requested that he sign it.

When a trailer was leased to Holdings, the lessor had the obligation to maintain and repair the trailer. Around January 1990, Albert allowed the JFT trailers to be serviced at Holdings's facility and using Holdings's material and labor. Travis kept the repair invoices for these trailers in his desk drawer. When Travis left Holdings, he took the invoices with him. The records indicated that $3,863.38 worth of Holdings's labor and material was used on JFT trailers and never repaid to the company. Prior to the instigation of this litigation, neither Albert nor Travis disclosed to Holdings that they spent over $3,800 in repair of their trailers. Additionally, they did not inform Holdings that repairs were made to Holdings's property without being charged.

In August 1990, Calise reviewed the drivers's settlement sheets and noticed a ten percent deduction from the gross revenue. Albert informed Calise that this was a reminder to the driver to make a payment on the trailer. Calise then received a telephone call from the company dispatcher who informed him that Albert and Travis were doing personal maintenance on their trucks at Holdings. By that time, Calise decided to terminate Albert based on his poor performance and the evaluation of Albert by an outside evaluator.

On 18 September 1990, Calise informed Albert he was being terminated. Feinberg, manager of asset protection, accompanied Calise and investigated the circumstances surrounding Albert's termination. Feinberg remained in Sikeston to interview several employees. From his investigation, he discovered allegations of Albert's management incompetence, hiring practices, management of fuel taxes, management of lease arrangement and JFT. Feinberg discovered Albert's conflict of interest regarding JFT and Transport as well as his $500 payments to Kentucky of the fuel tax. Feinberg informed at least one employee that the matters which they discussed were private and not to be disclosed to others.

Based on these interviews, Feinberg stated he believed that Albert was dishonest and he reported his findings in writing to his superiors. When an employee at Albert's car lot asked Feinberg why Albert was terminated, he replied that it was due to missing money and that Albert was a thief and a crook. That same employee then questioned Calise regarding Albert's termination and was told that, "All I can say is if you take things from

the company that you're not entitled to have, it could be considered stealing." Calise, when questioned, gave this same response to another person.

Feinberg was alleged to have told company employees that Albert was terminated because he stole a certain amount of money from the company. Albert's sister in law also heard Feinberg make statements that Albert was stealing from the company, was a thief and that the company was going to prosecute him for fraud. Another former employee testified that Feinberg said, "We'll be changing locks to keep Albert from coming in."

Calise denied making statements to the company's drivers that Albert was terminated for taking large sums of money, they caught him and were going to prosecute Albert. Carlyle, Albert's business partner in Transport Company, stated that he spoke with both Feinberg and Calise regarding the trailer leasing. He said they thought Albert was illegally operating a business within a business and that a large sum of money was unaccountable. Carlyle asked if they believed Albert took that money. Calise responded, "Yes; yes" and Feinberg nodded in agreement. Carlyle also stated that Calise never said Albert was stealing the money.

Albert did not continue working in the trucking industry following his termination from Holdings because he had an enforceable non-compete agreement. In 1992, Albert began a used car business which has expanded. Several testified that Albert still has a reputation for truth and honesty in the community. However, there also was testimony that Albert's reputation within the community diminished following his termination.

The jury returned a verdict and judgment was entered in favor of Albert on the slander claim. Actual damages were awarded in the amount of $425,000. Additionally, punitive damages were awarded in the amounts of $400,000 against Holdings, $200,000 against Calise and $225,000 against Feinberg.

## CONTRACT CLAIMS

Jackson claims the trial court erred in: (1) allowing evidence of mistake to show the parties's intent in executing the Buy–Sell Agreement; (2) ruling the phrase "and expense" in the Buy–Sell Agreement was ambiguous; (3) allowing parol evidence for the jury to determine the parties's intent; (4) denying Jackson's motions for directed verdict and judgment notwithstanding the verdict; and (5) awarding attorney's fees.

In its first point on appeal, Jackson alleges that the decisions made by the judge in the bench trial are binding upon the proceedings in the subsequent jury trial. Jackson contends that the second trial court erred in allowing evidence of mistake regarding the Buy–Sell Agreement because the equity trial foreclosed this possibility in its judgment. Jackson believes that because these particular decisions were not followed in the jury trial, the trial court erred. It additionally alleges in its supplemental brief that the jury trial could not modify the final judgment from the earlier bench trial pursuant to Rule 74.01. During its zealous representation, Jackson has misconstrued the law.

The applicable language of Rule 74.01(b) reads:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may enter a judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay. In the absence of such determination, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties.

Rule 74.01(b).

This case deals with multiple claims of action and multiple parties. The initial bench trial court entered its decision regarding this case as a means to facilitate the later jury trial. Its decision was delineated as a final and appealable order, but it failed to

rule on all of the pleaded defenses. *See Jackson*, 914 S.W.2d at 882. Emulating Rule 74.01(b), a judgment that leaves remedies regarding the same legal rights open for adjudication is not a final appealable judgment. *Id.* Our policy seeks to avoid superfluous review of multiple appeals stemming from the same facts and similar legal issues. *Id.* Therefore, because it is "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties," the trial court did not err in allowing evidence of mistake regarding the Buy–Sell Agreement in the jury trial. Rule 74.01(b); *Ward v. Hentges*, 844 S.W.2d 471, 472 (Mo.App. W.D. 1992). Point denied.

▨ Jackson next contends that the trial court erred in its determination that the term "and expense" was ambiguous as a matter of law. Even though neither Jackson nor Holdings agree on the meaning of the term, that is not enough to render the term ambiguous. *Smith v. Taylor–Morley, Inc.*, 929 S.W.2d 918, 922 (Mo.App. E.D.1996). In determining whether contract language is ambiguous, we look at the context of the entire agreement and determine if the language, given its plain and ordinary meaning as understood by a reasonable person, is reasonably susceptible to more than one construction. *State ex rel. Mo. Dam v. Rocky Ridge*, 950 S.W.2d 925, 929 (Mo.App. E.D. 1997) (citing *St. Louis Police Officers' Assn. v. Board of Police Com'rs*, 846 S.W.2d 732, 740 (Mo.App. E.D.1992)). Determination of an ambiguity is a question of law for the court to decide. *Alack v. Vic Tanny Intern. of Missouri, Inc.*, 923 S.W.2d 330, 337 (Mo. banc 1996). "Furthermore, an interpretation of a contract or agreement which involves unreasonable results, when a probable or reasonable construction can be adopted, will be rejected." *Rocky Ridge*, 950 S.W.2d at 929.

▨ Jackson argues that the term "and expense" is not ambiguous. He suggests that "expense" is commonly read as "expenses" and that the term is not capable of having more than one construction in its meaning. The relevant language from the Buy–Sell Agreement regarding the purchase price for Jackson's shares, reads:

The purchase price shall be equal to the Company's Pre–Depreciation Surplus times a multiple of 2.5 on the first, second and third anniversary dates, and a multiple of 2.75 on the fourth anniversary date, less Average Debt (less Average Cash In Bank Balance) times 10% less $10,000. If Pre–Depreciation Surplus is less than or equal to zero, then the purchase price for the Fifty (50) shares shall be $1.00.

For the purposes of this section, the following terms shall have the following meaning:

a) "Pre–Depreciation Surplus" shall be the post-tax profit of the Company adding back corporate income taxes (Federal and State), and expense, depreciation of fixed assets, less gains plus losses on the sale of assets and less interest income for the twelve month period immediately preceding the relevant anniversary date of the closing of the Purchase Agreement...

Looking at the context of the language, two meanings are apparent—that "expense" means all expenses, or that "expense" means expenses other than those already listed. The trial court concluded that the "and expense" read in conjunction with the other items listed in the same sentence created confusion because it made the other itemized expenses redundant. *See Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 250 (Mo.App. E.D. 1994). Therefore, the trial court reasoned that "and expense" was not meant to be interpreted as all expenses as Jackson argues and is ambiguous. We agree.

▨ Next, Jackson claims the trial court committed error in allowing the jury to hear parol evidence regarding the parties's intent upon entering into the Buy–Sell Agreement because it claims it was not ambiguous. The trial court must make the initial determination as to the ambiguity of a contract provision. As discussed above, the Buy–Sell Agreement was ambiguous because the term "and expense" created duplicative and redundant language within a single sentence. "Of course, whether the terms of an agreement are ambiguous is a question of law. If it is

determined that an ambiguity exists, it is then for the trier of fact to resolve the ambiguity." *Edgewater Health Care v. Health Systems,* 752 S.W.2d 860, 865 (Mo.App. E.D. 1988). Since we determined there was an ambiguous contract term, the trial court did not err in allowing the trier of fact to hear evidence of intent. Point denied.

Jackson argues, penultimately, that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict because Holdings did not establish every element of its affirmative defenses. Under this reasoning, Jackson claims that the measure of damages was conceded to be based on the proper date and mathematically correct provided that its interpretation of the Buy–Sell Agreement is correct.

■ A verdict will be directed in favor of the party with the burden of proof under certain circumstances.

It is a generally accepted rule in this state that a verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof....There is, however, a well-recognized exception to the rule. If the opponent, that is that party not having the burden of proof, admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him, and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. This is upon the theory that there is no question of fact left in the case and that upon the questions

of law involved the jury has no right to pass. [Citations omitted.]

*Coleman v. Jackson County,* 349 Mo. 255, 160 S.W.2d 691, 693 (1942). In review of a motion for a directed verdict, the burden of proof does not rest on the evidence of that moving party. *Curt Ogden Equipment v. Murphy Leasing,* 895 S.W.2d 604, 608 (Mo. App. E.D.1995). We must look exclusively to the evidence presented by the defending party.

■ Jackson fails to meet these specified conditions. Since we determined that an ambiguity existed within the Buy–Sell Agreement, the ambiguity is a question of fact for the jury to resolve. Hence, Jackson is unable to prove its entire case as a matter of law. Jackson claims that in order for us to direct the verdict in its favor, it seeks for us to interpret the Buy–Sell Agreement using evidence which it has presented.[1] Upon review of Jackson's directed verdict motion we need to look to the evidence as presented by Holdings, the defending party, rather than Jackson's evidence as the moving party. Point denied.

Finally, Jackson argues that the trial court lacked authority to award Holdings attorney fees against Kenneth Ray Jackson and Connie Sue Jackson as they were not true parties to the agreement but rather they were only nominal parties as ordered by the equity court. The contract terms provided that:

In the event any dispute between the parties hereto concerning this Buy–Sell Agreement should result in litigation, the prevailing party shall be reimbursed by the other for all reasonable costs, including, but not limited to, reasonable attorney's fees as may be allowed by a court of competent jurisdiction.

All of the plaintiffs were signatories to the Buy–Sell Agreement. Kenneth Ray Jackson and Connie Sue Jackson signed the Buy–Sell Agreement as individuals and as statutory trustees of Jackson Farms, Inc. and Albert

---

1. Jackson properly relies on one of Holding's experts; however, we are unable to locate the affidavit of that expert within the legal file nor has Jackson indicated in its brief where the expert's testimony is available. While this evidence may have aided Jackson's motion, it is not our responsibility upon appeal to search for this evidence. *See In re Carl McDonald Revocable Trust,* 942 S.W.2d 926, 932 (Mo.App. S.D.1997).

signed as trustee of the Jackson Family trust.

 In most circumstances, the trial court is granted broad discretion to award attorney's fees. *Gibson v. Adams*, 946 S.W.2d 796, 804 (Mo.App. E.D.1997). However, if a claim for attorney's fees is made under a provision of the contract, the trial court must comply with the terms set forth therein. *Harris v. Union Elec. Co.*, 766 S.W.2d 80, 89 (Mo. banc 1989). Here the contract terms provided that the prevailing party in a litigated dispute under the Buy–Sell Agreement would be awarded reasonable costs which includes attorney's fees. Kenneth and Connie Jackson signed the agreement and are parties to this litigation. We do not believe that the trial court erred in awarding Holdings attorney's fees against them.

## CROSS APPEAL

Holdings filed a cross appeal against Jackson on the contract claims. Since we affirm the contract claims of the trial court, we will dismiss Christian Salvesen Holdings, Inc.'s cross appeal as moot.[2]

## DEFAMATION CLAIMS

 Christian Salvesen, Inc., Calise and Feinberg (collectively, "CS") appeal the jury verdict awarding Albert actual and punitive damages for his claims of defamation. In its first point on appeal, CS argues that the trial court erred in denying its motion for a directed verdict because Albert did not prove that the statements attributed to CS were false, that they were not qualifiedly privileged and that Albert suffered actual damages from these statements.[3]

CS alleges that the statements made were truthful and therefore, not defamatory. In support of this position, CS cites Section 570.030 RSMo (1986) to show that Albert committed the crime of stealing. Under Section 570.030 RSMo (1986), a person steals when that person "appropriates property or

service of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion."

In review of a denied motion for directed verdict, we look to the evidence presented by the opposing party, Albert. *Curt Ogden Equipment*, 895 S.W.2d at 608 (Mo.App. E.D. 1995). Albert testified that a portion of the Kentucky Use Tax was attributable directly to SEMO rather than the new company which he managed and that he failed to inform CS. Instead of passing the $9,000 bill on, Albert paid it using CS money in $500 increments, the largest amount of money which he was authorized to pay. Each of Albert's checks were forwarded to Calise, but Albert did not recall discussion with Calise regarding the Use Tax.

We believe that Albert's action of paying a portion of the Kentucky Use Tax directly attributable to SEMO with CS's funds constituted stealing under Section 570.030 RSMo (1986). Since these actions were stealing, the statements made by CS were not defamatory because they were truthful. Therefore, the trial court erred in denying CS's motion for a directed verdict. Reversed.

Accordingly, Jackson's contract appeal is affirmed, Holdings's cross appeal is dismissed and CS's defamation appeal is reversed.

GRIMM, P.J., and GARY M. GAERTNER, J., concur.

---

**2.** During oral argument, counsel for Christen Salvesen Holdings, Inc. conceded that if Jackson's direct appeal were affirmed, the cross appeal would be moot and we need not address its issues therein.

**3.** We remind the attorneys for the parties to review the instructions in *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978) when drafting their points relied upon.