**U.S. NEUROSURGICAL, INC., Respondent,**

v.

**MIDWEST DIVISION–RMC, LLC, Appellant.**

**No. WD 70122.**

Missouri Court of Appeals, Western District.

March 2, 2010.

Kenneth L. Marshall, for Appellant.

Richard E. McLeod, for Respondent.

Before Court En Banc: THOMAS H. NEWTON, Chief Judge, Presiding, JOSEPH M. ELLIS, Judge, VICTOR C. HOWARD, Judge, LISA WHITE HARDWICK, Judge, JAMES E. WELSH, Judge, ALOK AHUJA, Judge, MARK D. PFEIFFER, Judge, KAREN KING MITCHELL, Judge and WILLIAM E. TURNAGE, Senior Judge.

VICTOR C. HOWARD, Judge.

Midwest Division—RMC, LLC (RMC) appeals the trial court's judgment upon a jury verdict finding for U.S. Neurosurgical, Inc. (USN) and awarding $1,919,124.49 in damages to USN on its breach of contract claim. On appeal, RMC claims that the trial court erred in denying RMC's motions for directed verdict and judgment notwithstanding the verdict because USN failed to make a submissible case for breach of contract. The judgment is reversed and remanded in part and affirmed in part.

### Factual and Procedural Background

In 1993, after extensive negotiations, Research Medical Center (Research) and USN entered into a contract.[1] USN agreed to construct a neuroradiosurgery facility on property leased from Research, to install and maintain a "Gamma Knife neuroradiosurgery unit" for the use of Research's patients, and to staff the unit with a physicist and other technical personnel. The Gamma Knife is used to perform neurosurgery on the brain without incision. Research agreed to install magnetic resonance imaging equipment in the facility, provide nursing and clerical personnel, and maintain responsibility for all doctors performing services in the facility.

The contract also provided Research with the sole entitlement to bill and collect for Gamma Knife procedures. A provision of the contract stated that USN was to receive eighty percent of the "actual cash collected" by Research for the Gamma Knife's use, but the provision also referred to another section of the contract which required "Hospital and [USN] concurrence for performance of any procedure which is reimbursed at a rate less than $12,500." The agreement further set forth a detailed schedule for monthly settlement of the collections. Approximately 1,500 Gamma Knife procedures were performed from 1994 through August 2007. In 2002 the contract was assigned from Research to the Cancer Institute; it was then assigned to RMC in the summer of 2004.

In December of 2005, USN began complaining to RMC about not receiving a "minimum reimbursement" for each procedure. It contended that under the terms of the contract, the parties had originally agreed USN would be paid a minimum of $10,000 per procedure. USN claimed a

---

1. Research and appellant RMC are separate entities. The contract at issue was later assigned to RMC.

"shortfall" in such minimum payments and sent RMC an invoice for $2,139,008.40. RMC continued to pay according to its existing accounting methods. In 2007, USN brought suit against RMC for breach of contract.

RMC moved *in limine* to prevent USN from presenting evidence of a "minimum payment" term in the original contract, contending that the contract was unambiguous as to its payment terms and that the parol evidence rule precluded the introduction of such evidence. RMC's motion was denied.

A jury trial was held. USN presented the testimony of its CEO, Alan Gold, and provided several different spreadsheets calculating the amounts it maintained it was due under a contractual minimum reimbursement requirement. The company's final submission calculated damages for each Gamma Knife procedure performed from the summer of 2004 onwards. The spreadsheet then credited USN with the difference for the procedures performed at less than the minimum payment, and added nine percent interest for total damages of $1,919,124.49.[2] RMC objected to the spreadsheets as based on false assumptions and contradicting the explicit terms of the contract. At the close of USN's case and at the close of evidence, RMC moved for a directed verdict, contending that USN had failed to present a

submissible case because there was no minimum payment requirement in the contract and USN had shown no damages because it had received eighty percent of actual cash collected by RMC. Its motions were denied.

The jury was given a verdict director for USN that was patterned after MAI 26.06, "which is the verdict director applicable to situations where both the terms of the contract and the breach are at issue," *Chrysler Fin. Co. v. Flynn*, 88 S.W.3d 142, 154 (Mo.App. S.D.2002).[3] The jury found for USN and awarded the amount in USN's final spreadsheet, $1,919,124.49.

RMC then moved in the alternative for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur of the damages award. It contended that USN's sole theory of liability on the contract was flawed because there was no minimum payment requirement, that USN had concurred in procedures being performed for less than $12,500, and that even if it had not concurred, USN had no damages because it benefitted from each incremental use of the knife through its receipt of eighty percent of the payment for each procedure. RMC also argued in the alternative that remittitur was required because USN admitted consenting to Medicare procedures being performed for a

2. RSMo section 408.020 provides in pertinent part: "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made[.]"

3. Instruction No. 5 provided as follows:
Your verdict must be for plaintiff if you believe: First, plaintiff and defendant entered into an agreement whereby plaintiff agreed to provide a gamma knife neurosurgical machine and operator, and defendant agreed to

not perform any procedure which was reimbursed at a rate less than $12,500 as indexed for inflation without the concurrence of plaintiff U.S. Neurosurgical, which established a minimum payment due to U.S. Neurosurgical, and
Second, plaintiff performed its agreement, and
Third, defendant failed to perform its agreement, and
Fourth, plaintiff was thereby damaged,
Unless you believe plaintiff is not entitled to recover by reason of Instruction number 6 or 7 [affirmative defenses].

lesser amount. The trial court denied the motion and this appeal by RMC followed.

## Standard of Review

■ We review the trial court's denial of motions for directed verdict and JNOV *de novo* to determine whether the plaintiff has made a submissible case. *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 595 (Mo.App. W.D.2008). "To make a submissible case, a plaintiff must present 'substantial evidence that tends to prove the facts essential to plaintiff's recovery.'" *Ryan v. Maddox*, 112 S.W.3d 476, 480 (Mo.App. W.D.2003) (quoting *Uptergrove v. Hous. Auth. of City of Lawson*, 935 S.W.2d 649, 651 (Mo.App. W.D.1996)). A submissible case in a breach of contract action requires the plaintiff to present substantial evidence to prove the following essential facts: "(1) a contract between the plaintiff and the defendant exists; (2) the plaintiff had rights and the defendant had obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages." *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 527 (Mo.App. E.D.2008).

In determining whether the plaintiff made a submissible case, we presume that the prevailing party's evidence is true, view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and disregard unfavorable evidence. *Id.*; *Ryan*, 112 S.W.3d at 480. The jury's verdict "will not be overturned unless there is a complete absence of probative facts to support it." *Ryan*, 112 S.W.3d at 481. If reasonable minds can differ on a question before the jury, we cannot disturb the jury's verdict on appeal. *Id.*

## Legal Analysis

■ RMC raises four points on appeal based on the arguments asserted in its post-trial motion. In its first point, RMC contends that the trial court erred in denying its motions for directed verdict and JNOV because USN failed to make a submissible case on its breach of contract claim in that the contract did not provide for a guaranteed minimum payment for each use of the Gamma Knife.

The dispute as to USN's compensation centers on the language in two sections of the contract. The relevant language in section 4.01 is:

> As [USN]'s sole compensation ... [RMC] agrees to pay to [USN] eighty percent (80%) of the actual cash collected by [RMC] from billing for the use of the Gamma Knife Equipment and the Neuroradiosurgery Facility. (*Reference is made to Section 2.11 which requires [RMC] and [USN] concurrence for performance of any procedure which is reimbursed at a rate less than $12,500 as indexed for inflation.*)

(Emphasis added.) The language referencing compensation in section 2.11 is: "If the available third party payor reimbursement for any ... procedure is less than Twelve Thousand Five [Hundred] Dollars ($12,500), then both [RMC] and [USN] have to concur before the procedure may be performed...." USN argues that the reference in section 4.01 to section 2.11 should be interpreted to create a minimum payment requirement pursuant to which USN is entitled to a minimum payment of $10,000 (eighty percent of $12,500) for each use of the Gamma Knife, unless it agreed to accept a lower amount. RMC contends that, based on the language of section 4.01, the contract unambiguously guarantees to USN eighty percent of the actual cash collected by RMC and nothing more. RMC further asserts that section 2.11 does not provide for a minimum payment in that it requires concurrence only for the performance of a procedure, and does not require agreement on a particular amount to be received by USN.

■ The jury decided that the contract provided USN a guaranteed minimum payment for the use of the Gamma Knife. The only question is whether that issue was properly submitted to the jury. The determination of whether a contract is ambiguous is a question of law subject to *de novo* review. *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 367 (Mo.App. W.D.2008). Disputed language is ambiguous if an average person would find it reasonably susceptible of more than one meaning. *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 839 (Mo.App. W.D.2004). "[W]here an ambiguity is found, the resolution of the ambiguity is a question of fact for the jury to determine using extrinsic evidence." *Teets v. Am. Family Mut. Ins. Co.*, 272 S.W.3d 455, 462 (Mo.App. E.D.2008).

■ RMC intently focuses on its favored language in section 4.01 of the agreement and considers it the only language pertinent to the issue of compensation. However, "[i]n determining the intent of the parties to a contract, we review the terms of a contract as a whole, not in isolation." *Tuttle v. Muenks*, 21 S.W.3d 6, 11 (Mo.App. W.D.2000). Section 9.12 of the contract provides, "The captions, section and article numbers appearing in this Agreement in no way define, limit, construe or describe the scope of the intent of such sections or articles of this Agreement." The fact that section 4.01 is labeled "U.S. Neuro Compensation" is not determinative.

RMC's interpretation of these provisions—that USN is without recourse when RMC charges less than the agreed minimum—may be one alternative, but the average person could reasonably find the language susceptible to another meaning.

The common theme in both sections is that, unless otherwise agreed, each use of the Gamma Knife shall be reimbursed at a minimum rate of $12,500. As set forth in section 4.01, RMC must pay USN eighty percent of the amount collected. Section 4.01 also makes it clear that the sole compensation due USN is on a per use basis of the machine and facility. For example, no rent or other fees are involved. So, when the machine is idle, RMC owes nothing. On the other hand, if RMC, without USN's consent, accepts less than the agreed upon minimum payment, it breaches the clear language of sections 2.11 and 4.01. It is a reasonable interpretation that the parties contemplated a minimum payment for each use of the Gamma Knife.

Another facet of RMC's interpretation is its contention that the language of section 2.11 requires USN to agree to the actual performance of the Gamma Knife procedure when the reimbursement will be less than $12,500, rather than requiring USN to agree on the amount of compensation it will receive for such a procedure. In other words, RMC interprets the contract to give USN the right to prohibit the performance of Gamma Knife procedures. Conversely, USN maintains that section 2.11 does not require its consent for the actual performance of the procedure but, rather, requires it to concur as to the payment it would receive.[4] Under USN's interpretation, in the absence of USN's acceptance of an amount less than $10,000, RMC could still perform the procedure but would owe USN $10,000 in accordance with the minimum payment provision.

As with the contractual language concerning USN's compensation, the provision regarding USN's concurrence is ambigu-

---

4. Consequently, RMC's interpretation leads to a result which would essentially give nonmedical personnel the authority to make medical decisions for RMC, whereas USN's inter-

pretation simply provides USN with the ability to make financial decisions which are in its own best interest.

ous if an average person would find it reasonably susceptible of more than one meaning. *Lacey*, 131 S.W.3d at 839. When the phrases related to concurrence in sections 2.11 and 4.01 are read in isolation, the language could reasonably lead to RMC's conclusion that USN had to consent to RMC's use of the Gamma Knife if the reimbursement rate was less than $12,500. However, in the context of the entirety of both sections 2.11 and 4.01, USN's interpretation that sections 2.11 and 4.01 include a baseline provision that guarantees USN at least $10,000 for each use of the Gamma Knife is just as reasonable.

RMC's notion that the contract unambiguously provided that it can unilaterally decide the amount of reimbursement for each procedure is a theory mugged by reality. Unquestionably the parties agreed to split cash collected from their venture. However, RMC gingerly dances around the prominent references in both sections 2.11 and 4.01 requiring the parties to concur before a procedure can be performed for less than $12,500. And that is the crux of USN's claim—that RMC broke its promise by unilaterally doing procedures for less than the agreed minimum. USN's interpretation of the contract need not be the only interpretation as long as it is a reasonable interpretation.

RMC's microscopic focus on a phrase here and the book definition of a word there prevents a common sense analysis of the entire agreement. It is entirely reasonable that the minimum reimbursement

amount was part of a business model relied upon for the venture to pays the bills and yield a profit.[5]

RMC's restrictive reading of the agreement would allow it to ignore the agreement of the parties to require that both parties consent to a reimbursement of less than the minimum amount of $12,500. Such a reading guts the apparent intent of section 2.11 and leaves USN holding a right without a remedy. " 'It is preferable to attribute a reasonable meaning to each clause and harmonize all provisions, rather than leave some provisions non-functional....' " *Rabius v. Brandon*, 257 S.W.3d 641, 646 (Mo.App. W.D.2008) (quoting *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.*, 126 S.W.3d 820, 827 (Mo. App. W.D.2004)).

An average person could find the agreement's language relating to compensation reasonably susceptible of more than one meaning, rendering it ambiguous. Accordingly, it was for the jury to sift through and weigh the evidence presented on the various issues related to payments due. RMC's first point is denied.

In its next point, RMC contends that the trial court erred in allowing USN to submit its verdict director, Instruction No. 5, which contained USN's interpretation that the contract guaranteed a minimum payment. RMC argues that because the relevant language in the contract was unambiguous, the interpretation of the contract was a question of law for the court, rather than a question of fact for the jury. However, because we have determined that an

**5.** In support of USN's interpretation of the contract, part of Gold's testimony dealt with several instances in which the Cancer Institute had paid USN $10,000 for the use of the Gamma Knife when, under RMC's interpretation, USN would have been entitled to less than $10,000. Gold stated that there was no explanation for a payment of $10,000 in those instances, other than the existence of a minimum payment provision in the contract.

Gold also testified about USN and RMC's contract negotiations and noted that it was important for USN to receive a minimum level of reimbursement so it could get a return on its investment. Gold stated that, therefore, USN negotiated for a minimum payment provision which would give USN an assurance that it would receive at least $10,000 for each procedure, absent its consent to a lesser amount.

ambiguity existed, there was a question of fact for the jury to resolve. *Teets*, 272 S.W.3d at 462. USN's verdict director was properly submitted to the jury. RMC's point is denied.

In its final two points on appeal, RMC contends that the trial court erred in denying its motions for directed verdict and JNOV because: (1) USN failed to make a submissible case in that USN was not damaged by additional uses of the Gamma Knife; and (2) USN's case for breach of contract should not have been submitted to the jury because USN consented to each use of the Gamma Knife. As the issues of USN's damages and its consent are intertwined, we address them together.

■■■ In awarding damages, the objective is to make the injured party whole by placing it in the position it would have been in if the contract had been performed. *Guidry*, 269 S.W.3d at 532. In an action for breach of contract, damages may be measured by the loss of the benefit of the bargain. *Id.* To recover damages, the party claiming damages resulting from a breach of contract must prove "the existence and amount of damages with reasonable certainty." *Am. Laminates, Inc. v. J.S. Latta Co.*, 980 S.W.2d 12, 23 (Mo.App. W.D.1998). Thus, the claimant must submit "a basis for a rational estimate of damages without resorting to speculation." *Id.*

RMC argues that USN suffered no damage resulting from any use of the Gamma Knife, even if it was used without USN's consent for a procedure where reimbursement was less than $12,500, because it was undisputed at trial that there were no incremental costs associated with additional uses of the Gamma Knife and that USN saw at least some monetary benefit any time that the Gamma Knife was used.

However, this argument is based on RMC's contention that the parties' contract did not contain a minimum payment requirement. Because the jury found that there was a minimum payment provision in the contract, a claim premised upon the absence of such a provision is immaterial.

■■■ Moreover, USN submitted substantial evidence at trial to support its claim that it was entitled to benefit of the bargain damages based on the contract's guaranteed minimum payment of $10,000 plus interest.[6] USN submitted an exhibit at trial that calculated the damages for each procedure that was performed and reimbursed at a level below $12,500 without USN's consent. USN's CEO, Alan Gold, testified that, based on the minimum payment provision, he expected that if a procedure was performed and RMC did not obtain USN's consent for a reimbursement less than $12,500, USN would still receive at least $10,000. Therefore, for these procedures, USN calculated their damages as the difference between the $10,000 minimum payment it was entitled to under the contract and what USN actually received. In light of the jury's acceptance of USN's interpretation of the contract, USN made a submissible case on the issue of damages, to the extent that it did not consent to a level of reimbursement less than $12,500.

■■■ In its final argument, RMC addresses the relationship between USN's alleged consent and its damages. RMC argues that USN's case for breach of contract should not have been submitted to the jury because USN consented to each use of the Gamma Knife and, with respect to Medicare outpatients, Gold told RMC "we accept a lower amount."

At trial, Gold stated several times that USN's position had always been that RMC

---

6. RMC does not argue that, if this court were to find that USN's interpretation of the con-

tract was reasonable, USN's method of measuring its damages is improper.

should use the Gamma Knife any time it was medically appropriate and that USN did not have the power to make medical decisions, such as preventing RMC from using the Gamma Knife on a patient. However, we have previously decided that USN's permission to perform procedures was not a concurrence to be paid an amount less than the minimum guaranteed by the contract. Still, RMC argues that, even if we accept USN's interpretation of the contract, USN actually agreed to be reimbursed in amounts less than the minimum.

RMC argues that USN knew RMC performed procedures which were reimbursed at a rate less than $12,500 and "accepted the payments made." Accordingly, RMC believes that it was entitled to a directed verdict on its affirmative defense of consent. With regard to the Medicare outpatients, we agree. At trial, USN submitted an exhibit which consisted of an e-mail from Gold to several employees of RMC. In the e-mail, Gold stated, "We understand that Medicare outpatient pays less than $12,500 currently and we accept a lower amount." RMC argues that this e-mail is evidence of USN's consent to receive a payment under the $10,000 guaranteed by the contract for Medicare outpatient pro-

cedures. Gold testified at trial that he had always known that RMC received less than the contractual minimum for Medicare outpatient procedures. Additionally, the e-mail clearly establishes that USN agreed to accept less than $10,000 for those procedures.

■ "When the claim of error on appeal is the failure to direct a verdict because of proof of an affirmative defense ... the moving party is only entitled to a directed verdict if that party proved its affirmative defense as a matter of law." *Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n*, 192 S.W.3d 461, 475 (Mo.App. W.D.2006). Therefore, if the evidence of RMC's affirmative defense compelled a finding in its favor without resolution of any disputed factual issues, it was entitled to a directed verdict. *Wolfe v. State ex rel. Mo. Highway & Transp. Comm'n*, 910 S.W.2d 294, 300 (Mo.App. W.D.1995). Because USN acknowledged that it agreed to accept less for Medicare outpatient procedures, there were no factual issues remaining for the jury to decide.[7] The judgment as to Medicare outpatient procedures is reversed.

■ The damages assessed for non-Medicare procedures are a different matter.[8] Although not specifically set forth in

---

**7.** Despite USN's explicit acceptance of a lower payment for such procedures, Gold testified at trial that USN still sought the difference between the $10,000 contractual minimum and what USN actually received from RMC for Medicare outpatient procedures. But where USN gave its express consent to accept a payment of less than $10,000, USN cannot convincingly claim that it was nevertheless entitled to a $10,000 payment.

Gold attempted to justify USN's position at trial by explaining that, while USN agreed to accept less than $10,000 and the parties never agreed on any specific amount, he believed USN and RMC would have negotiated and settled on a payment amount that both parties thought was fair. There was no evidence at

trial to show that USN thereafter made an effort to negotiate with RMC regarding the payments it would receive for Medicare outpatient procedures.

Where USN expressly agreed to accept payments of less than $10,000 for Medicare outpatient procedures but did not negotiate a specific amount with RMC, USN's evidence regarding its damages for those procedures is largely speculative. *See Mprove v. KLT Telecom, Inc.*, 135 S.W.3d 481, 491 (Mo.App. W.D.2004) (holding that a party's testimony regarding contract payments it "probably would have" negotiated did not constitute substantial evidence to support a damages award).

**8.** For purposes of assessing RMC's damages argument, references to "non-Medicare pro-

its point relied on, RMC also suggests that, because USN did not challenge the non-Medicare payments that were less than the contractual minimum, USN implied its permission for RMC to perform procedures for less than the guaranteed amount. However, the evidence regarding non-Medicare payments is highly disputed.

USN requested damages for underpayment for a period beginning in June 2004, when RMC became a party to the contract, and ending in March 2008. RMC points to testimony of its employee indicating that USN never specifically demanded it be paid "a guaranteed minimum payment of $10,000 for each use of the Gamma Knife until December 2005." RMC also states that USN received monthly statements and payments from previous parties to the contract since 1994 and that "beginning at least as early as 2000, on 'many' occasions USN received less than $10,000 ... for use of the Gamma Knife." But, it is not clear whether these occasions of underpayment were for non-Medicare procedures or instead for the lower paying Medicare outpatient procedures that USN consented to. RMC introduced documents into evidence reflecting payments to USN of less than $10,000. However, the documentation is insufficient to prove as a matter of law a pattern of reimbursement below the contractual minimum for non-Medicare patients so as to show USN intentionally waived full payment or gave its implied permission to receive a lesser amount.

The contract required that a minimum amount be paid for every procedure, something USN should not have to independently demand. Gold testified that the minimum payment provisions were crucial to his business plan. There is certainly no evidence that USN ever expressly consented to payments below the minimum regarding non-Medicare procedures. In fact, Gold was adamant that he never agreed to such payments. And, nothing indicates that Gold knowingly accepted lower payments for those procedures. He testified that when he personally discovered the underpayments in October 2005, he promptly brought the issue to RMC's attention for resolution. It is apparent that the parties treated below minimum payments for non-Medicare procedures differently than Medicare outpatient procedures. The evidence did not unambiguously prove RMC's affirmative defense of implied permission regarding non-Medicare procedures. Accordingly, the issue was properly submitted to the jury to make a factual determination regarding the implications to be drawn from the evidence.

The judgment regarding Medicare outpatient procedures is reversed. In all other respects, the judgment is affirmed. The case is remanded for recalculation of the damages consistent with this opinion. The court may receive any further evidence it deems necessary.

ELLIS, HARDWICK, PFEIFFER and MITCHELL, JJ., concur in the opinion of HOWARD, J., for the court.

NEWTON, C.J., dissents in separate dissenting opinion.

WELSH and AHUJA, JJ. and TURNAGE, SR. J., concur in dissenting opinion.

THOMAS H. NEWTON, Chief Judge, dissenting.

USN's sole theory of damages was premised on breach of a "minimum payment" requirement. Because there was no "minimum payment" guarantee expressed in the contract, I respectfully dissent.

cedures" also encompass Medicare inpatient procedures.

Contract interpretation is a question of law. *Newco Atlas, Inc. v. Park Range Constr., Inc.*, 272 S.W.3d 886, 891 (Mo. App. W.D.2008). We read contracts inside established rules of construction. We seek to effectuate the parties' intent. We consider the agreement as a whole; we harmonize the provisions, give meaning to the terms, and we do so through the plain, ordinary, and express language used in the document. *See Midwest Div.–OPRMC, LLC v. Dep't of Soc. Servs., Div. of Med. Servs.*, 241 S.W.3d 371, 379 (Mo.App. W.D. 2007). That the parties purport to disagree as to the agreement's meaning does not create ambiguity. *Rabius v. Brandon*, 257 S.W.3d 641, 645 (Mo.App. W.D.2008). Moreover, "[c]ourts are prohibited from creating ambiguities by distorting contractual language that may otherwise be reasonably interpreted." *Id.* at 645 (internal quotation marks and citation omitted). Because the contract between USN and RMC may reasonably be interpreted through its express terms, the question of a "minimum payment" should not have been submitted to the jury.

Section 4.01 expressly provides that USN's "sole compensation" was to be eighty percent of the "actual cash collected by Hospital." It then provides for the parties' annual review of the accounting methodology, which is "based on current third party reimbursement mechanisms." "Sole" is synonymous with "only." To perform something "solely" is to act "to the exclusion of alternate or competing things." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2168 (1993). Compensate means to "recompense, or to pay." BLACK'S LAW DICTIONARY 283 (6th ed.1990). "Actual" means "existing presently in fact; having a valid objective existence . . . [s]omething real, in opposition to constructive or speculative." *Id.* at 34. Collect means "[t]o receive payment." *Id.* at 263.

In section 4.01, by its plain terms, the parties expressly provided for and limited USN's compensation: its sole payment under the contract was to be eighty percent of RMC's cash receipts from patients and their insurers. This meaning is further reinforced by section 4.03's detailed procedures for RMC's advances to USN of "80% of the estimated reimbursement to Hospital," its provision of a settlement procedure for the occasion of RMC's actual collections exceeding estimated collections (RMC would owe USN 80% of the excess), and in particular by the section's provision for USN's reimbursing RMC for any shortfall if the collections did not reach the estimate for the preceding month. The parties obviously anticipated the eventualities that an insurer's expected or actual reimbursement for the procedure might be less than $12,500 and agreed that the actual sum received would be split 80/20 between the parties.

In section 2.11 the parties first set forth a preapproval requirement: before a procedure is performed, the patient's "third party payor" must preapprove the procedure or RMC must be satisfied the patient has the ability to pay for the procedure herself. The section next provides that: "If the available third party payor reimbursement for any neuroradiosurgery procedure is less than Twelve Thousand Five Hundred Dollars ($12,500), then both Hospital and U.S. Neuro have to concur before the procedure may be performed." "Concur" means "[t]o agree; accord; act together; consent." BLACK'S LAW DICTIONARY 291 (6th ed.1990). Consequently, the plain language of section 2.11 provides that the parties must agree before performing the procedure if the expected third-party reimbursement is less than the stipulated amount. This language of concurrence is repeated within section 4.01's parenthetical reference to "[s]ection 2.11 which . . . requires concurrence for performance."

When we interpret contracts, we give meaning to every clause. *Mathews v. Modern Woodmen of Am.*, 236 Mo. 326, 139 S.W. 151, 155 (1911). Equally as fundamental is that "[s]eeming contradictions must be harmonized away if that course be reasonably possible." *Id.* Reading the contract in accord with our established rules, section 4.01 and section 2.11 create two distinct promises. Section 4.01 promises *compensation:* it provides that USN is to be given eighty percent of the *actual cash* collected from patients and their insurers. Section 2.11 promises *concurrence:* it provides that the parties will *agree* prior to the procedure being performed where the expected reimbursement is less than $12,500.

Neither provision sets forth a minimum payment guarantee. The words "minimum" and "guarantee" do not appear in the document. Conversely, the terms of the "sole payment" are clearly expressed. Section 4.01 expressly limits "compensation" to "actual cash collected." Section 4.03 provides for advances to be returned to RMC when there is a shortfall in collections. Section 2.11 expressly promises "concurrence," not "payment." [9]

Because there is no "minimum payment" expressed, USN's theory requires implying a promise not stated in the agreement. We do not favor implied promises: "we presume that the instrument contains the entire contract, and we will not imply additional provisions unless necessary to effectuate the parties clear intentions." *Giessow Rests., Inc. v. Richmond Rests., Inc.*, 232 S.W.3d 576, 579 (Mo.App. E.D.2007). This is particularly the case where, as here, the contract was between two sophis-

ticated parties fully capable of expressly stating their intent. More critically, USN's belated theory requires implying a promise that contradicts the agreement's express terms: *sole compensation.* It is axiomatic that "[n]o implied provision can be inserted as against the express terms of the contract." *Conservative Fed. Sav. & Loan Ass'n v. Warnecke*, 324 S.W.2d 471, 478–79 (Mo.App.1959). Ambiguity requires at least two *reasonable* interpretations of the agreement's plain meaning. *See Frieberger v. Lawyers Title Co. of Missouri*, 831 S.W.2d 731, 734 (Mo.App. E.D.1992); *Jackson v. Christian Salvesen Holdings, Inc.*, 978 S.W.2d 377, 383 (Mo. App. E.D.1998). Because USN's reading runs afoul of our established rules of construction, its theory cannot support a finding of ambiguity.

Moreover, the majority implicitly finds that the contract is ambiguous, and was thus properly before the jury, because the agreement does not specify a remedy for breach of section 2.11's concurrence provision. However, the general rule is that "'[t]he proper measure of damages is a question of law for the trial court's determination,'" *not* a factual question to be put to a jury for decision. *Forney v. Mo. Bridge & Concrete, Inc.*, 112 S.W.3d 471, 474 (Mo.App. W.D.2003); *see also, e.g. Cornejo v. Crawford County*, 153 S.W.3d 898, 902 (Mo.App. S.D.2005). The fact that section 2.11 specifies a contractual obligation, without specifying a remedy for breach of that obligation, does not create an ambiguity or render the concurrence obligation illusory. "Common law elements of a breach of contract action do not

---

9. The fact that the agreement requires concurrence *before* performance of the procedure, and at a time when reimbursement is only an expectancy, also belies the notion that section 2.11 creates a minimum payment guarantee. Despite RMC's good-faith, pre-procedure expectation of reimbursement at or

above $12,500, there remains every possibility that post-procedure collection would fall short of that amount. Yet on USN's theory, it would be entitled to $10,000 even in cases where RMC expected yet failed to collect $12,500 and the pre-procedure concurrence obligation was not even triggered.

require, to the extent a contract is in writing, that the writing must specify the availability of a claim for money damages in the event of a breach." *Coventry Manor Phase II Assocs., L.P. v. Hainen,* 904 S.W.2d 279, 281–82 (Mo.App. W.D.1995) (holding that claim for compensatory damages for breach of partnership agreement was available despite agreement's failure to explicitly authorize it).

Consequently, contrary to the majority's opinion, the agreement's failure to specify damages for breach of the concurrence provision neither creates ambiguity nor leaves USN holding a "right without a remedy." If RMC breached section 2.11 through failing to obtain USN's concurrence, USN is free to seek damages. However, the only damages theory USN presented at trial was breach of a "minimum payment" requirement, not breach of a concurrence provision. As RMC points out, the reason behind USN's theory is obvious: it has no damages from breach of a promise to concur because it presented no evidence that it incurred any incremental costs for the performance of individual procedures when the Gamma Knife would otherwise be sitting idle, while it obviously received additional money from each procedure. There is no evidence that, for example, higher-paying patients were turned away because the procedure was performed on lower-paying patients, or that RMC did not diligently, and in good faith, collect the full amount that patients and third-party payors were willing and able to pay. Moreover, the only evidence offered as to what USN *might* have done if RMC *had* sought concurrence is the testimony of Alan Gold that it was his full expectation that USN would have been able to negotiate something. As the majority notes, we have previously rejected such testimony as too speculative to support a damages award. *See Mprove v. KLT Telecom,* 135 S.W.3d 481, 491 (Mo. App. W.D.2004) (finding testimony as to what negotiations "probably" would have occurred insufficient to show any loss). "[A] damage award must be based on evidence more tangible than a gossamer web of shimmering speculation and finely-spun theory." *Id.* (internal quotation marks and citation omitted).

Regardless of whether RMC complied with section 2.11 by seeking pre-procedure concurrence, it does not logically follow that we imply into the contract some liquidated damages provision requiring RMC to pay USN $10,000 for each procedure where there was not concurrence. The law does not award parties contract benefits they did not bargain for. *See, e.g., Smith ex rel. Stephan v. AF & L Ins. Co.,* 147 S.W.3d 767, 780 (Mo.App. E.D.2004). Nor may the law "elevate the non-breaching party to a better position than she would have enjoyed had the contract been completed on both sides." *Guidry v. Charter Commc'ns., Inc.,* 269 S.W.3d 520, 533 (Mo.App. E.D.2008).

We do not interpret agreements so as to render sections of them "useless and inexplicable." *Midwest Div.–OPRMC, LLC,* 241 S.W.3d at 380. USN's reading of the agreement disharmonizes the contract, requires ignoring the plain language of section 2.11, renders the language of sections 4.01 and 4.03 useless, and negates the very meaning of the phrases "sole payment" and "actual cash collected." It further inserts a promise that was not bargained for by the parties, was not expressed by the parties, and was not the parties' course of performance for over eleven years. It thus bestows a windfall on USN for sitting on its hands and belatedly inventing a new and self-serving interpretation of the agreement. Because the agreement cannot reasonably be read to contain a "minimum payment" requirement, this issue should not have been submitted to the jury.

Consequently, I would grant RMC's first point and reverse the judgment.